## IN THE UNITED STATES DISTRICT COURT, DISTRICT OF KANSAS

| | |
|---|---|
| MAURICIO CARDENAS )<br><br>Plaintiff, )<br><br>VS. )<br><br>JOSE HERNANDEZ and )<br>THE CITY OF GARDEN CITY, KANSAS )<br><br>Defendants. ) | Case No. |

### COMPLAINT

COMES NOW, Mauricio Cardenas, by and through his attorney, Joseph T. Welsh, and makes complaint against Detective Jose Hernandez and the City of Garden City, Kansas for violation of his constitutional rights under the color of state law.  In support thereof, Mauricio Cardenas states to the Court the following:

### PARTIES, JURISDICTION AND VENUE

1.      Mauricio Cardenas ("Mauricio") is a resident of Haskell County, Kansas and resides within the City of Lawrence, Kansas.

2.      City of Garden City, Kansas ("City") is and was at all times relevant hereto, a municipal corporation within the State of Kansas.

3.      Detective Jose Hernandez ("Detective Hernandez") is a police officer employed by the City, and upon good faith and belief is a resident of the State of Kansas.

4.      The Court has federal subject matter jurisdiction over this matter pursuant to 42 U.S.C. § 1983.

1

5.      Venue is proper pursuant to 28 U.S.C. § 1391 as substantially all of the acts giving rise to the claims set forth in this Complaint occurred in Finney County, Kansas and Haskell County, Kansas.

6.      There is no requirement under federal law requiring Michael to exhaust any administrative remedies prior to filing a complaint alleging 1983 claims.

## FACTS

### *Mauricio, Patricia Balderas, H.C., and L.C.*

7.      Mauricio was previously involved in a relationship with Patricia Balderas, and they lived together prior to 2017. ("Patricia").

8.      Mauricio and Patricia had two children together:  H.C. and L.C.

9.      In 2016, Mauricio and Patricia ended their relationship and no longer lived together.

10.     In and around June 2020, Patricia, H.C. and L.C. resided at 1009 ½ Bancroft St., Garden City, Finney County, Kansas ("Bancroft"), an address at which Mauricio had never lived.

11.     In and around June 2020, Mauricio resided with his second wife, Cynthia Cardenas, at 310 West Carson St., Sublette, Haskell County, Kansas.

12.     Mauricio and Cynthia Cardenas had entered into a lease agreement with Watson Enterprises to lease 310 West Carson St., Sublette, Haskell County, Kansas.

13.     Mauricio and Cynthia Cardenas had utilities for 310 Carson St., Sublette, Haskell County, Kansas in their name.

14.     In June 2020, Mauricio was employed in Sublette, Kansas at Stoppel Dirt, LLC.

15.     In June 2020, Mauricio's paycheck stubs reflect that he worked forty-seven (47) to sixty (60) hours a week at Stoppel Dirt, LLC.

16.     In June 2020, Mauricio's employer transported him to Liberal, Seward County, Kansas for work each day that he worked.

### Charlotte Sandoval, Tina Sandoval, ADL, ANL

17.     ADL and ANL are Tina Sandoval's daughters.

18.     Charlotte Sandoval is Tina Sandoval's mother and grandmother to ADL and ANL.

19.     In June 2020, ADL and ANL resided with their grandmother, Charlotte Sandoval, at 1009 Bancroft St., Garden City, Finney County, Kansas.

20.     The residence was a duplex and Patricia, H.C. and L.C. resided in the adjoining unit.

### Report of rape and abuse, and the initial investigation

21.     On February 22, 2022, Tina Sandoval contacted the Garden City, Kansas Police Department ("GCPD") to report that ADL had reported to her that she "had been raped by her neighbor while living at 1009 Bancroft."

22.     Officer Adam Breeson ("Officer Breeson") of the GCPD contacted Tina Sandoval who advised that the individual ADL said raped her was dating Patricia at the time.

23.     It was reported to Officer Breeson that Charlotte did not recall the name of this individual, nor did ADL.

24.     The time period for when the event was alleged to occur was between June 7, 2020 and June 19, 2020.

25.     On February 27, 2022, Officer Breeson contacted Patricia and several of her acquaintances and family members to try to identify the individual Patricia was dating in June 2020.

26.     Patricia's acquaintances and family members could not recall who she was dating in 2020.

27.     Patricia herself was uncertain who she was seeing at that time as she believed she was seeing multiple subjects.

28.     On March 10, 2022, Tina Sandoval, ADL and ANL were in Garden City, Kansas while they were visiting from out of town.

29.     Detective Hernandez arranged for ADL and ANL to have forensic interviews conducted by the Western Kansas Child Advocacy Center ("WKCAC").

30.     Tina Sandoval also advised that she had now had an opportunity to speak with ANL and ANL had advised that the same individual who was alleged to have raped ADL, also groped and fondled her.

*Forensic Interviews – Details related to the perpetrator*

31.     WKCAC inquired of ADL what the perpetrator looked like.  ADL advised of the following: "he looked bald, with a beard"; "he rode a bike, and was bald with black sunglasses"; she thought he had a tattoo "on his arm" or on his neck running to his shoulder; and ADL described him as a "neighbor."

32.     WKCAC inquired of ANL what the perpetrator looked like.  ANL advised of the following: the male had "short, brown or black hair"; she described the male as clean shaven; the male had some tattoos but she could not remember where; and he wore baggy sweatpants.  ANL was unable to disclose any more about what the perpetrator looked like.

***Prior reports***

33.     Detective Hernandez, on March 14, 2022, did a review of prior incidents involving Patricia to determine if any males linked to her might be the suspect.

34.     Detective Hernandez determined that there were incidents involving Patricia and Mauricio related to domestic violence calls, which prompted Detective Hernandez to look at Mauricio.

35.     Detective Hernandez learned upon further investigation that there were two prior allegations by Patricia against Mauricio alleging Mauricio was inappropriate with L.C. and Patricia's daughter from another relationship.

36.     Detective Hernandez also learned that Mauricio had no documented contact with GCPD or any other agency in 2020.

37.     Not noted in Detective Hernandez's report or affidavit is that no charges were ever brought against Mauricio and the CINC report was denominated as unsubstantiated.

***Second interview of Patricia***

38.     Detective Hernandez interviewed Patricia a second time.

39.     Detective Hernandez never attempted to determine when Patricia and Mauricio were last romantically involved.

40.     Detective Hernandez never attempted to determine if Mauricio was even ever at the Bancroft address.

41.     Detective Hernandez testified at Mauricio's preliminary hearing that he advised Patricia that Mauricio was a suspect for the crimes alleged by ADL and ANL.

42.     Detective Hernandez did learn some information about the relationship between Patricia and Mauricio.  He learned the following: 1) the relationship was strained due to ongoing

custody issues; 2) Mauricio would only come over due to Patricia and Mauricio having children together; and 3) L.C., the child in which Detective Hernandez noted was allegedly touched by Mauricio, was residing with Mauricio and he had full custody of the child.

43.     Instead of asking questions related to determining if Mauricio was an individual that ever came to the Bancroft address or lived there, whether Mauricio and Patricia were romantically involved, or whether she knew where Mauricio lived in 2020, Detective Hernandez discussed Patricia's belief that a government agency was tracking Mauricio's internet habits because of his porn addiction to adult porn.

44.     Detective Hernandez noted that he needed to conduct a follow up interview with Patricia later.  That follow up interview was never done.

### Photo identification regulations.

45.     GCPD has specific policies related to eyewitness identification.  The reason GCPD instituted these policies is to avoid misidentification of suspects, because "it is as much the responsibility of the police to protect the innocent from misidentification, as it is to assist in the conviction of the guilty."

46.     The instructions direct a police officer to assemble a photo line up based on the witness' description of the suspect, not the appearance of the suspect.

47.     The instructions provide "If the suspect has a unique or unusual feature, such as facial scars or severe injuries, the officer preparing the array should create a consistent appearance between the suspect and fillers by adding the feature to the fillers or by covering the area on every photograph."

48.     The instructions further state that "If the witness identifies a photograph, the officer should ask the witness how certain he is of the identification and officers should ask the witness not to use a numerical scale, but rather his own words."

49.     The instructions provide if the photo array is to be shown to a subsequent witness, the photo array should be shuffled to ensure there is no collision between the witnesses.

50.     GCPD represents that it trains all its personnel in eyewitness identification procedures.

### *The photo lineup.*

51.     At Mauricio's preliminary hearing, Detective Hernandez testified that he assembled the photo array to be used in a photo lineup with ADL and ANL.

52.     Detective Hernandez testified that one of the descriptions of the suspect was that he was bald and he admitted in his testimony at Mauricio's preliminary hearing that none of the photos in the photo array were bald.

53.     Detective Hernandez testified further that only one photo in the photo array had a tattoo on the right side of their neck and the tattoo was not covered in the photo array.

54.     Upon information and belief, Detective Hernandez forwarded the photo array that he assembled to be presented by the Council Bluffs, Iowa Police Department.

55.     Detective Matt Dyer of the Council Bluffs Police Department conducted the photo lineup with ADL and ANL.

56.     ADL viewed the photo array and was unable to identify anybody as the perpetrator.

57.     ANL viewed the photo array and stated that the photo of Mauricio "looks like him."  ANL never identified the photo as the suspect, only that it looked similar to him.

58.     Detective Matt Dyer did not shuffle the photo array between showing the photo array to each victim.

59.     Detective Matt Dyer did not ask any follow up questions to determine how certain ANL was or what was similar about the photo to the man that assaulted her.

### *Missing email*

60.     Detective Hernandez's report from May 2, 2022 reflects that he received an email from Detective Matt Dyer that reflected that ADL did not identify any individuals from the photo array.  His report also states that Detective Matt Dyer reported that ANL had identified Mauricio as the perpetrator and that Ana had stated she "knew that was the suspect from the tattoos on his neck."

61.     The video of the photo identification does not support the quote.  Rather it confirms that ANL said that the photo "looks like him."

62.     During discovery in the criminal prosecution of Mauricio, Mauricio's counsel repeatedly requested the production of the email from Detective Hernandez and the Finney County Attorney's Office was never able to produce the email.

63.     Video of the non-identifications were forwarded to Detective Hernandez.

### *Mauricio is Detective Hernandez's suspect*

64.     On May 31, 2022, Detective Hernandez listed Mauricio as his suspect, even though Mauricio was a suspect to Detective Hernandez as early as March 15, 2022.

### *Request by Detective Hernandez for an interview of Mauricio*

65.     Detective Hernandez reached out to the Haskell County Sheriff's Office (misnamed as the Sublette PD in his report) to request that it reach out to Mauricio and request that he contact Detective Hernandez.

66.     On June 21, 2022, Detective Hernandez learned from the Haskell County Sheriff's Department that Mauricio had declined to be interviewed by Detective Hernandez.

67.     On June 23, 2022, Mauricio called Detective Hernandez, but was unable to reach him.

68.     On June 30, 2022, Detective Hernandez reached out to Cynthia Cardenas to request that Mauricio contact him.

69.     On July 7, 2022, Mauricio called and spoke with Detective Hernandez.

70.     During the course of that interview Mauricio explained that he had been working a lot and had not had time to get back with Detective Hernandez.

71.     Mauricio further advised that he had moved from Garden City, Kansas to Sublette, Kansas prior to 2020 and that he did not live in Garden City, Kansas in 2020; that he did not know the victims in the case; that Patricia had made allegations against him and that those allegations had been investigated; that he had not been to Garden City, Kansas in 2020; and that his wife was the one who picked up the girls in Garden City, Kansas if there was visitation.

72.     Detective Hernandez noted his file that he needed to speak with Patricia to further interview her about the information Mauricio provided to him on July 7, 2022.

73.     There is no record in the police file that Detective Hernandez ever followed up with Patricia.

74.     There is no evidence that Detective Hernandez did anything to investigate: how long Mauricio had lived at his present address; where Mauricio worked; how many hours a week Mauricio worked at his job; whether Mauricio was required to work in locations outside of Sublette; whether Mauricio had utilities in Sublette, Kansas or Garden City, Kansas; whether Cynthia Cardenas picked up the children; whether Patricia and Mauricio were so estranged that

Mauricio would not go to the Bancroft apartment; whether Mauricio owned a bike; whether Mauricio owned sunglasses; whether Mauricio had different facial hair or hairstyle in 2020; and who Patricia may have been seeing that was named Brady as she reported Brady as a possible individual that she was dating in June 2020 to Officer Breeson.

### *The affidavit supporting the arrest warrant.*

75.     On August 4, 2022, Detective Hernandez swore out an affidavit seeking an arrest warrant for Mauricio.

76.     That affidavit contains false information, fails to include exculpatory information and/or information that is incomplete, and is generally misleading.

77.     The affidavit contains the following false information:

   a)     Cardenas was identified as the individual who raped ADL;

   b)     Cardenas was identified as the individual who inappropriately touched ANL;

   c)     Detective Hernandez confirmed Mauricio was residing with Patricia and their two daughters at the time of the alleged crime;

   d)     Mauricio was residing at the Bancroft apartment at the time of the alleged crime;

   e)     Mauricio was identified as the suspect by ANL by photo identification;

   f)     Mauricio refused to speak with Detective Hernandez.

78.     The affidavit fails to contain the following exculpatory information and/or information that is incomplete:

   a)     Mauricio denied living in Garden City, Kansas during 2020;

   b)     Mauricio denied being in Garden City, Kansas during 2020;

   c)     ADL described the suspect as bald;

d)      ANL described the suspect as clean shaven; and

d)      The suspect was described by both girls as having a limp, which Mauricio did not have;

79.     The affidavit contains the following misleading information:

a)      The affidavit references Cardenas as the individual who raped ADL and inappropriately touched ANL throughout the affidavit instead of the word suspect when that was never established by Detective Hernandez;

b)      Detective Hernandez paints the picture that Mauricio did not want to speak with him and the affidavit suggests Mauricio did not speak with him, when Mauricio called Detective Hernandez voluntarily and did in fact speak with him.

### *Mauricio is arrested and is incarcerated.*

80.     On August 26, 2022, Mauricio was arrested and incarcerated.

81.     Mauricio remained incarcerated for nearly seven (7) months, until March 17, 2023, when he was released after a preliminary hearing in which all charges against Mauricio were dismissed.

82.     Mauricio, while incarcerated, lost wages, lost benefits, lost opportunity and ultimately was terminated from his employment.

### *Preliminary Hearing*

83.     Detective Hernandez testified at the preliminary hearing.

84.     Detective Hernandez testified at the preliminary hearing that he never established or clarified if Mauricio lived with Patricia at the Bancroft apartment, despite his affidavit.

85.     Detective Hernandez admitted that a neck tattoo is distinguishing characteristic.

86.     Detective Hernandez admitted that his determination that Mauricio Cardenas was the person who committed the crimes against ADL and ANL was based on finding out that Mauricio Cardenas was the father of Patricia's children.

## CLAIMS

## COUNT I – VIOLATION OF CIVIL RIGHTS – LACK OF PROBABLE CAUSE FOR ARREST

87.     Mauricio incorporates paragraphs 1 – 85 of his Complaint as if set forth fully herein.

88.     Mauricio has a 4th Amendment right to be free of an arrest without probable cause.

89.     At all times set forth herein, Detective Hernandez, acting as a Garden City police officer, was acting under the color of state law.

90.     Detective Hernandez violated Mauricio's rights when he misrepresented material facts in his affidavit to create probable cause that did not exist.

91.     Detective Hernandez violated Mauricio's rights when he failed to include exculpatory evidence and/or included incomplete information in the affidavit supporting the arrest warrant to create probable cause that did not exist.

92.     Detective Hernandez violated Mauricio's rights when he drafted the affidavit supporting the arrest warrant in such a way as to be misleading to create probable cause that did not exist.

93.     Mauricio has been damaged by Detective Hernandez's violation of his civil rights.

WHEREFORE, Mauricio prays that the Court render judgment for him and against Detective Hernandez, for compensatory damages, punitive damages, attorney's fees, costs

sustained herein, and for such other and further relief as this Court deems just and equitable under the circumstance.

## **COUNT II – VIOLATION OF CIVIL RIGHTS – ILLEGAL DETENTION**

94.     Mauricio incorporates paragraphs 1 – 92 of his Complaint as if set forth fully herein.

95.     Mauricio has a 4th Amendment right not to be illegally detained without probable cause.

96.     At all times herein, Detective Hernandez, acting as a Garden City police officer, was acting under the color of state law.

97.     Detective Hernandez violated Mauricio's rights when he drafted the affidavit supporting Mauricio's arrest, and subsequent incarceration that included material misrepresentations of fact, failed to include exculpatory evidence in the affidavit, and/or included incomplete information in the affidavit to create probable cause to arrest and detain Mauricio.

98.     Detective Hernandez did not correct his material misrepresentations of fact at any time between Mauricio's arrest and his preliminary hearing resulting in Mauricio's continued detention.

99.     Mauricio has been damaged by Detective Hernandez's violation of his civil rights.

WHEREFORE, Mauricio prays that the Court render judgment for him and against Detective Hernandez, for compensatory damages, punitive damages, attorney's fees, costs sustained herein, and for such other and further relief as this Court deems just and equitable under the circumstance.

## COUNT III – VIOLATION OF CIVIL RIGHTS – FAILURE TO TRAIN

100.     Mauricio incorporates paragraphs 1 – 98 of his Complaint as if set forth fully herein.

101.     City has a duty to train its police officers regarding eyewitness identification and drafting affidavits to support arrest warrants.

102.     Upon information and belief, the City failed to train its police officers with respect to eyewitness identification procedures that should be followed, and with respect to the importance of not including material misrepresentations of fact in an affidavit supporting an arrest warrant.

103.     The City's failure to train its police officers, specifically Detective Hernandez is the cause of Detective Hernandez's illegal arrest and detention of Mauricio.

104.     Mauricio was damaged by the City's failure to train Detective Hernandez.

WHEREFORE, Mauricio prays that the Court render judgment for him and against the City for compensatory damages, attorney's fees, costs sustained herein, and for such other and further relief as this Court deems just and equitable under the circumstance.

/s/ Joseph T. Welsh_____
Joseph T. Welsh #78138
207 S. Inman St.
P.O. Box 606
Sublette, Kansas 67877
(620) 510-5030 – Phone
(620) 510-5029 - Fax
joe@jtwelshlaw.com