## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

MAURICIO CARDENAS,

        *Plaintiff,*

v.

        Case No. 24-1046-EFM

JOSE HERNANDEZ & CITY OF GARDEN
CITY, KANSAS,

        *Defendants.*

## MEMORANDUM AND ORDER

Before the Court are two motions filed by Defendants Detective Jose Hernandez and the City of Garden City, Kansas. The first is a Motion for Summary Judgment (Doc. 54) on Plaintiff Mauricio Cardenas's § 1983 claims of unlawful arrest, illegal detention, and failure-to-train. In this motion, Detective Hernandez asserts qualified immunity and Garden City asserts that it cannot be held liable because there was no underlying constitutional violation. The second is a Motion to Exclude Expert Testimony (Doc. 57). Cardenas opposes both motions. For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment and denies the Motion to Exclude as moot.

## I.      Factual and Procedural Background[1]

In August 2022, Cardenas was arrested and detained as the suspect in a child rape case. At a preliminary hearing in March 2023, a court found that there was no probable cause establishing that Cardenas had committed the alleged crimes. Cardenas brought this suit alleging that his arrest

---

[1] The following facts are uncontroverted unless otherwise noted.

and detention were the result of an affidavit containing false information and omitting exculpatory information. The circumstances leading to his arrest are detailed below.

On February 26, 2022, Garden City Police Department ("GCPD") officers received a report from Tina Sandoval that her daughter, A.E.L., disclosed that she was raped in June 2020 at 1009 ½ N Bancroft St. in Garden City, Kansas. Officers learned that A.E.L. was 12 years old at the time of the rape, that she had been living with her grandmother, Charlotte Sandoval, at 1009 N Bancroft, and that the perpetrator was a male neighbor. The two Bancroft addresses are assigned to a conjoined duplex. Officers identified Patrica Balderas as the neighbor who resided at 1009 ½ Bancroft at the relevant time. On February 27, 2022, officers contacted Balderas who relayed that she had been seeing multiple men in June 2020, and that the only name she could recall was "Brady."

Detective Hernandez was later assigned to investigate the case. An advocate at the Western Kansas Children's Advocacy Center interviewed A.E.L. on March 10, 2022. A.E.L. stated that she believed the perpetrator was the stepfather of the girls who lived next door, describing him as a bald male with a beard and tattoos on his arm or the right side of his neck or shoulder area. A.E.L. recalled that H. was the name of one of the minor girls who lived next door. A.E.L. stated she was raped on two occasions by this male.

A.N.L., A.E.L.'s older sister, was also interviewed. She stated that she had walked to a laundromat with a male as they searched for a piece of cardboard to cover a hole. At the laundromat, the male rubbed his penis on her. She described the perpetrator as a male with short brown or black hair and having some tattoos. A.N.L. further identified the perpetrator as a neighbor who she previously thought to be nice and kind, had watched them play in an inflatable swimming pool, and had gotten along well with her grandmother and brother.

Cardenas and Balderas were formerly in a romantic relationship but were never married. They have two daughters together—H. is the name of one of them. On March 15, 2022, Detective Hernandez interviewed Balderas. Balderas later testified in a deposition that, during this interview, she told Detective Hernandez that Cardenas did not live with her or visit her residence at Bancroft. Throughout the investigation, Detective Hernandez never confirmed whether Cardenas lived at 1009 ½ Bancroft.

On May 1, 2022, Detective Hernandez prepared a photo array of six photographs of males. One of the photographs depicted Cardenas, which showed he has a visible neck tattoo. Only one other "filler" photograph in the array depicted a man with a tattoo on his neck. At the time, A.E.L. and A.N.L. were living in Council Bluffs, Iowa, so Detective Hernandez forwarded the photo array to the Council Bluffs Police Department ("CBPD"). Using the photo array provided by Detective Hernandez, CBPD Detective Matt Dyer conducted photo line-up interviews with both A.E.L. and A.N.L. Defendants assert, but Cardenas disputes, that the photo line-up was conducted blind, meaning that at the time Detective Dyer conducted the line-up, he did not know who the suspect was. Detective Dyer cycled through each of the six photographs twice during each interview.

During the interview with A.E.L., she did not affirmatively identify any of the pictures as the suspect. A.N.L., however, remarked "He looks like the guy" when she was shown the picture of Cardenas on the first cycle. She did not identify any other photos as the suspect. On the second cycle through the photo array, A.N.L. again remarked that "He does look like him." Detective Dyer responded, "Okay. What makes that stand out? What makes that . . . you think that's him?" A.N.L. replied that "I know that he has tattoos on him and the tattoo's on his neck." Detective Dyer prepared a report in which he stated that A.N.L. identified Cardenas as the suspect. The interviews were video recorded. Detective Hernandez reviewed those videos before he completed

his probable cause affidavit. Detective Hernandez testified, upon reviewing the interviews, that he believed the instructions provided by Detective Dyer to each girl before the line-up were sufficient to ensure the line-up was appropriate and fair. He also testified that there was no uncertainty in A.N.L.'s identification of Cardenas.

On June 21, 2022, Cardenas returned a call from the Haskell County Sherriff's Office. In that phone call he was told that the GCPD wanted to speak with him. Cardenas told the deputies that he had no reason to meet with them because he did not live in Garden City. On that same day, Detective Hernandez was informed that Cardenas declined to be interviewed. On July 7, 2022, Cardenas and Detective Hernandez spoke over the phone. Cardenas told Detective Hernandez that he knew that GCPD had been trying to reach him but explained that he had to work and had been busy. Cardenas told Detective Hernandez that he did not know the victims, and that he had moved from Garden City to Sublette, Kansas approximately six months after he was released from prison in 2018. He further stated that he did not live in Garden City at any point in 2020. When asked if he had visited Garden City to pick up his daughters from Balderas, Cardenas said "No," before elaborating, "Each weekend we go pick up my" before changing the "we" to "my wife picks up my daughters." Cardenas also told Detective Hernandez that Balderas had accused him of inappropriately touching his daughter and stepdaughter, but he had not done so, the allegations had been investigated, and he felt the claims were harassment. This was the only communication of any kind between Cardenas and Detective Hernandez.

On August 4, 2022, Detective Hernandez swore out an affidavit seeking an arrest warrant for Cardenas. The substantive portion of the affidavit provides the following:

> On February 26th, 2022, at approximately 5:55 PM; officers of the Garden City Police Department were dispatched to a rape prior call. The incident was learned to have occurred in June of 2020, at l009 ½ N Bancroft St. Garden City, Finney County, Kansas 67846.

Officer Adam Bresson contacted Tina Sandoval, mother of the victim - identified as [A.E.L.]. It was learned [A.E.L.] had disclosed she had been raped while she was living with her sister [A.N.L.] and grandmother (Charlotte Sandoval) in Garden City. During the phone call, it was learned the suspect was a male boyfriend of a neighbor which lived next to their apartment. The female neighbor was identified as Patricia Balderas - who resided at l009 ½ N Bancroft St. in Garden City. [A.E.L.] was 12 years of age at the time of incident. Tina Sandoval, [A.E.L.] and her brother and sister all currently reside in Council Bluff, Iowa. This case was assigned to Detective Jose (Jesse) Hernandez on March 10th, 2022, learning the sister - [A.N.L.] had been inappropriately and sexually touched, by the same male in the same approximate date(s), as well.

Due to the family being in the city - visiting family, when the case was assigned; Sandoval agreed to attend and have a Forensic Interview scheduled with the Western Kansas Children's Advocacy Center on March 10th, 2022, at approximately 2:00 PM. The interview was conducted by WKCAC Advocate - Melisa Fulton. During the interview, it was disclosed [A.E.L.] had been raped by a male - later identified as Mauricio Cardenas Jr. It was learned Cardenas had asked [A.E.L.] to step inside his apartment, offering to take her to the store. Once inside the apartment, Cardenas had pulled off her clothes as he touched her "butt" and her "boobs." [A.E.L.] stated "he stuck it in there" referring to his penis going into her vagina. It was further disclosed Cardenas was "going in and out" of her vagina - with his penis as he held her down with one of his hands from the back of her neck. [A.E.L.] stated she was on her stomach and could "kinda breathe." [A.E.L.] further stated she had told Cardenas to stop - to which he told her "Shut the fuck up bitch"; stopping only due to [A.E.L.]'s sister and brother walking up to the apartment. It was learned Cardenas had threatened to kill [A.E.L.]'s family if she said anything to anyone. This incident was stated to have occurred on June 9th, 2020 - based on her recollection of law enforcement responding (unrelated incident) to the apartments around that date.

[A.E.L.] continued, stating she had been raped twice by Cardenas, stating the second time had taken place in Cardenas' daughter's bedroom of the apartment. [A.E.L.] stated Cardenas had grabbed her while she was playing outside and took her to the room. [A.E.L.] stated she had pushed Cardenas, but Cardenas pushed her on to the bed, where Cardenas took her clothes off - touching her "butt" and "boobs." [A.E.L.] stated Cardenas had also "kissed her" on her vagina - with his "mouth going inside her vagina." It was also learned Cardenas had made her put her mouth on his penis until "white stuff" came out. [A.E.L.] stated the "white stuff" had gone in her mouth - to which she spat it out at Cardenas. [A.E.L.] stated this made Cardenas slap her on her face, on the left cheek, as he directed her to put her clothes back on and leave - due to his daughters arriving. This incident was stated to have occurred on June 11th, 2020 - due to her recollection of law enforcement responding to her apartment (unrelated incident) days prior. This interview applies to case number: 22-0 00835.

Due to the above-mentioned crimes committed by Cardenas, having been potentially committed upon [A.N.L.] a second Forensic Interview was scheduled with the Western Kansas Children's Advocacy Center on March 10th, 2022, at approximately 2:00 PM. The interview was conducted by WKCAC Advocate – Melisa Fulton. During the interview, it was disclosed [A.N.L.] had been sexually assaulted by a male - later identified as Mauricio Cardenas Jr. During the interview, it was learned Cardenas was a neighbor, who had "rubbed on her, touching and molesting her." It was also stated Cardenas had "touched her in inappropriate parts, like her breasts and her butt." [A.N.L.] elaborated, stating this had occurred several times - to include one of the incidents occurring in an unknown laundromat. [A.N.L.] stated Cardenas had "rubbed his thingy" believing "it" (the penis) was out of his clothing - onto her "butt" while they were in the laundromat. [A.N.L.] expressed she was scared during the assault, leaving her to have nightmares in believing Cardenas "would come back to hurt her." [A.N.L.] stated she remembered Cardenas had two daughters and provided descriptors which later matched the identification of the suspect. This interview applies to case number: 22-001201.

After further investigative work, it was confirmed Balderas, Cardenas and their two daughters were all residing at 1009 ½ N Bancroft St. throughout the month of June 2020; in the apartment next to where [A.E.L.] and [A.N.L.] were residing. It was also stated [A.E.L.] could remember the name of one of the suspect's daughters to be [H.]. Investigation revealed Cardenas was in a relationship with Balderas and having two daughters together, confirming said name to be the name which [A.E.L.] could remember. After the interview, Sandoval and her daughters had returned to Council Bluff, Iowa - where on 05/01/2022 at approximately 4:00 PM - a photo line-up was conducted by Council Bluff, Iowa Police Department. Detective Matt Dyer with Council Bluff PD - assisted in providing the lineup to both [A.E.L.] and [A.N.L.]. During the line-up, [A.N.L.] identified Mauricio Cardenas Jr. to be the suspect of the allegations listed. Previous case numbers in Finney County, Kansas - regarding an Aggravated Indecent Liberties with a Child and other sexual abuse allegations have listed Cardenas as a suspect - offending against his stepdaughter and biological daughter. The case numbers listed are 18-006443 and 21-004414. Several attempts to speak with Cardenas have been made - resulting in requesting Sublette, Kansas Police Department's help in locating Cardenas. Upon contact by Sublette PD, Cardenas was asked if he would be willing to speak with Detective Hernandez in reference to the allegations, Cardenas decline[d] to meet with Detective Hernandez - stating he would not speak with him.

Based on witness statements and investigative case work, your affiant has probable cause to charge Mauricio Cardenas Jr. with two counts of Rape, one count of Aggravated Criminal Sodomy, one count of Kidnapping - one count of Battery, One Count of Aggravated Indecent Liberties with a Child and one count of Criminal Threat.

On August 25, 2022, the Finney County District Court executed a warrant for Cardenas's arrest based upon this affidavit and GCPD arrested Cardenas the following day. Cardenas was detained at the Finney County Detention Center from August 26, 2022, until March 17, 2023. On March 17, 2023, the Finney County District Court held a preliminary hearing at which the Court found there was no probable cause to proceed with the charges against Cardenas, stating that while there was no dispute that a crime occurred, the State had not met its burden to establish that Cardenas was the person who had committed the crime.

Cardenas filed this suit on March 15, 2024, and an Amended Complaint on September 24, 2024. He brings three claims under 42 U.S.C. § 1983. In Count I, he alleges Detective Hernandez and Garden City violated his Fourth Amendment right against unreasonable seizure because the affidavit purporting to establish probable cause leading to his arrest misrepresented material facts and omitted exculpatory evidence. In Count II, Cardenas asserts Detective Hernandez and Garden City also violated his Fourth Amendment rights when he was illegally detained based upon the faulty affidavit. In Count III, Cardenas seeks to hold Garden City liable for failing to adequately train Detective Hernandez in photo line-up procedures.

Cardenas has identified an expert, Harold C. Heitman, in this case. Heitman criticizes the photo line-up and the affidavit. Specifically, Heitman expresses concern that the photo line-up did not comply with GCPD's policy related to eyewitness identification, that the tattoo visible in Cardenas's photo made him stand out, that he believes the photo line-up was not blind, and that Detective Dyer did not ask A.N.L. how confident she was in her identification of Cardenas. However, he agrees that Detective Dyer's verbal instructions before the photo line-up adhered to generally accepted standards and practices, that both A.N.L. and A.E.L. reported that they knew the suspect beforehand, and that he had no reason to dispute that A.E.L. and A.N.L. could see the

suspect at the time the crimes were committed. Further, he agrees Cardenas's photo in the line-up was consistent with A.N.L.'s description of Cardenas as a male with short brown or black hair and some tattoos. Finally, Heitman opined that a photo line-up identification was sufficient to establish probable cause.

Defendants filed the present Motion for Summary Judgment and Motion to Exclude Expert Testimony on March 21, 2025. Cardenas filed timely Responses, and the Defendants filed timely Replies. The matters are fully briefed and ripe for the Court's consideration.

## II.      Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[2] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[3] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[4] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[5] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits— conclusory allegations alone cannot survive a motion for summary judgment.[6] The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[7]

---

[2] Fed. R. Civ. P. 56(a).

[3] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (citing *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[4] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[5] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (citation omitted).

[6] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998)).

[7] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

### III.    Analysis

#### A.    Claims against Detective Hernandez

Detective Hernandez moves for summary judgment, asserting the defense of qualified immunity. It is well established that "[i]ndividual defendants named in a § 1983 action may raise a defense of qualified immunity."[8] "The doctrine of qualified immunity shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law."[9] When the defense of qualified immunity is asserted, the burden shifts to the plaintiff to show: "(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct."[10] "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity."[11] "In determining whether the plaintiff has shouldered this *heavy burden*, '[the Court] construe[s] the facts in the light most favorable to the plaintiff as the non-movant.'"[12]

Cardenas's unlawful arrest and illegal detention claims are premised upon Fourth Amendment violations. To prevail on these claims, Cardenas must demonstrate that his arrest and detention were without probable cause.[13] Probable cause is a flexible, common-sense standard requiring merely that the facts available would warrant "a man of reasonable caution in the belief" that the suspect committed the crime.[14] It is not proof beyond a reasonable doubt, nor is it a

---

[8] *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 460 (10th Cir. 2013).

[9] *Id.* (internal quotations and citation omitted).

[10] *Id.* (citation omitted).

[11] *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citation omitted).

[12] *Corona v. Aguilar*, 959 F.3d 1278, 1282 (10th Cir. 2020) (emphasis added) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

[13] *Kerns v. Bader*, 663 F.3d 1173, 1187 (10th Cir. 2011).

[14] *Texas v. Brown*, 460 U.S. 730, 742 (1983) (citation omitted).

showing that a suspect's guilt is "more likely true than false."[15] Rather, "the relevant question is whether a 'substantial probability' existed that the suspect committed the crime," which requires more than a bare suspicion.[16]

### 1.    Prong 1: Violation of a Right

Cardenas alleges that the affidavit supporting the warrant for his arrest contained falsities and omitted exculpatory information. This sort of allegation is often referred to a *Franks* claim after the Supreme Court's decision in *Franks v. Delaware.*[17] "In *Franks*, the Supreme Court held that affiants seeking arrest warrants violate the constitution when they knowingly, or with reckless disregard for the truth, include false statements in a supporting affidavit or omit information which, if included, would prevent the warrant from lawfully issuing."[18] Under these circumstances, the Court reviews the affidavit as if the false information were set aside and the omitted information were included.[19] From there, the Court determines whether the modified affidavit establishes probable cause.[20]

Cardenas argues that this question should be left to the jury. But "the predicate for submitting a qualified immunity question to the jury is the existence of disputed issues of material fact—that is, the question of what actually happened."[21] Here, there are nearly no disputes as to what actually happened. This is evidenced in Cardenas's Response in which he only controverts

---

[15] *Kerns*, 663 F.3d at 1188 (citing *Brown*, 460 U.S. at 742).

[16] *Id.* (citations omitted).

[17] 438 U.S. 154 (1978).

[18] *Kapinski v. City of Albuquerque*, 964 F.3d 900, 905 (10th Cir. 2020) (citing *Franks*, 437 U.S. at 171).

[19] *Kerns*, 663 F.3d at 1188 (citations omitted).

[20] *Id.*

[21] *Gonzales v. Duran*, 590 F.3d 855, 859 (10th Cir. 2009).

one of Defendants' numbered facts. Further, whether probable cause exists in the modified affidavit is an appropriate question for the Court when, as here, Cardenas's claims are premised upon an alleged *Franks* violation.[22]

Cardenas identifies the following as either falsities or omissions from the affidavit: the fact that A.N.L. identified Cardenas in a photo line-up; conflicting descriptions of the suspect's appearance; where Cardenas was living; Cardenas's relation to Patricia Balderas and his daughters; whether Detective Hernandez spoke with Cardenas; and finally, the inclusion of previous cases of child sex offenses in which Cardenas was identified as a suspect. The Court will address each in turn.

### a.    The Photo Line-Up

Cardenas contends that Detective Hernandez should not have included A.N.L.'s photo line-up identification of Cardenas in the affidavit because the photo line-up was flawed. Cardenas asserts that the photo line-up was flawed because: Cardenas's neck tattoo was a distinguishing characteristic not present in the other photos; the photo line-up was not blind; that not all of the instructions were read; and that A.N.L was not asked how certain she was of Cardenas's identification as her assailant. Ultimately, Cardenas suggests that A.N.L.'s identification should be excluded from the affidavit.

When an identification procedure is challenged, the inquiry is two-pronged: (1) whether the identification procedure was impermissibly suggestive; and (2) if so, whether it was otherwise reliable in view of the totality of the circumstances.[23]

---

[22] *Kapinski*, 964 F.3d at 906 (citations omitted).

[23] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1219 (10th Cir. 2024) (citing *Johnston v. Makowski*, 823 F.2d 387, 391 (10th Cir. 1987)).

Assuming, without deciding, that Cardenas can satisfy the first prong and show that the photo line-up was impermissibly suggestive, Cardenas cannot demonstrate that the identification was otherwise unreliable.[24] "Where a witness has some familiarity with a suspect . . . the existing acquaintanceship supports a finding of reliability."[25] Here, it is uncontroverted that A.N.L. stated in her forensic interview that she was familiar with her assailant. Specifically, before the incident, A.N.L. believed her assailant was nice and kind, that he watched her play in an inflatable swimming pool, and that he had gotten along with her grandmother and brother. Moreover, on the day of the incident, her assailant had walked with her to a laundromat. Cardenas's expert agrees that these facts show that the suspect was someone that A.N.L. knew beforehand. The level of familiarity between A.N.L. and her assailant is sufficient to overcome any suggestiveness associated with a flawed identification procedure. "Put simply, this case does not concern 'an encounter with a total stranger under circumstances of emergency or emotional distress.'"[26] Because the uncontroverted facts support a finding that A.N.L. was familiar with the suspect— which overcomes any suggestive effect of an improperly conducted photo line-up—the uncontroverted facts support a finding that the identification was otherwise reliable.

---

[24] Cardenas spends much time discussing how the photo line-up arranged by Detective Hernandez and conducted by Detective Dyer did not comply with GCPD's eyewitness identification policy. Cardenas emphasizes the policy's importance given that the Kansas legislature's mandate that police departments maintain such a policy. Because the Court assumes, without deciding, that Cardenas can demonstrate that non-compliance with the policy resulted in an improperly suggestive photo line-up procedure, this topic warrants little discussion from the Court.

[25] *Johnson*, 99 F.4th at 1221 (citing *Halim v. Mitchell*, 492 F.3d 680, 706 (6th Cir. 2007) ("[A]ny prior acquaintance with another person substantially increases the likelihood of an accurate identification."); *United States v. Burgos*, 55 F.3d 933, 942 (4th Cir. 1995) (finding that because the witness knew the defendant personally, "the chance of misidentification from a concededly suggestive photo display is virtually non-existent"); *United States v. Osorio*, 757 F. App'x 167, 170–71 (3d Cir. 2018) (concluding that an identification was not unreliable despite defendant's concerns because the person who identified the defendant was already familiar with the defendant).

[26] *Johnson*, 99 F.4th at 1222 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 112 (1977)).

But even if the photo line-up was the result of a suggestive procedure *and* otherwise unreliable, it does not amount to a Fourth Amendment violation. "[A] suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest."[27] "The Supreme Court has recognized '*a due process* check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime.'"[28] "The constitutional interest implicated in the challenges to police identification procedures is *evidentiary* in nature."[29] "[T]he salient constitutional concern is whether an eyewitness misidentification results in a criminal defendant not having a fair trial."[30] Accordingly—even if Cardenas were to demonstrate that the photo line-up was impermissibly suggestive and unreliable—the appropriate remedy would be—at most—the exclusion of A.N.L.'s in-court identification of Cardenas at trial.[31] Even though the trial-admissibility of A.N.L.'s identification of Cardenas may be in dispute, the dispute does not preclude its use to support a finding of probable cause.[32] Thus, the Court cannot agree with Cardenas that his Fourth Amendment rights were violated when Detective Hernandez included A.N.L.'s identification of Cardenas in the affidavit.

---

[27] *Id.* at 1218 (quoting *Brathwaite*, 432 U.S. at 113 n.13).

[28] *Id.* (emphasis added) (citing *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012)).

[29] *Id.* at 1219 (emphasis in original) (citing and quoting *Alexander v. City of S. Bend*, 433 F.3d 550, 555 (7th Cir. 2006)).

[30] *Id.* (citing *Brathwaite*, 432 U.S. at 113.

[31] *Perry*, 565 U.S. at 232 ("An identification infected by improper police influence, our case law holds, is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial." (internal citation omitted)).

[32] *See Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012) ("The Supreme Court stressed . . . that evidence need not be admissible at trial in order to support a finding of probable cause. A conclusion that there is probable cause for arrest (or indictment) just gets the criminal process started.").

Finally, as discussed above, when an affidavit is alleged to be improperly supported, the procedure is for the Court review the affidavit after omitting *false* information.[33] Here, although there may be a factual dispute as to the suggestive nature of the photo line-up, it is undisputed that A.N.L. was familiar with her assailant. Moreover, she indicated that Cardenas "looked like the guy" and on the second cycle stated that "he does look like him." Cardenas's contention that the photo line-up was flawed does not materially alter the underlying fact that A.N.L. "identified [Cardenas] to be the suspect of the allegations" as Detective Hernandez reported in the affidavit. Accordingly, it is not a *false* statement that should be set aside in the Court's review of the affidavit for probable cause.

> b.    Conflicting Descriptions of the Suspect's Appearance

Cardenas contends that the affidavit should have stated that A.E.L and A.N.L. provided varying descriptions of Cardenas's appearance. Specifically, A.E.L. said the suspect was bald and had a beard, whereas A.N.L. said he had short brown or black hair. In a *Franks* claim alleging that information was omitted from the affidavit, a plaintiff must show that the "information was 'material' in that its inclusion would have vitiated probable cause for issuing the warrant."[34] Next, he must show that the affiant "acted with the requisite mental state [knowingly or with reckless disregard for the truth] in omitting the information."[35]

The affidavit states that A.N.L. "provided descriptors which later matched the identification of [Cardenas]." But Cardenas contends that the affidavit should have elaborated that A.E.L. provided a different description—namely, that she described the suspect as bald with some

---

[33] *See Kerns*, 663 F.3d at 1188.

[34] *Kapinski*, 964 F.3d at 905 (citing *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015)).

[35] *Id.* (citing *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).

facial hair. Cardenas asserts that these various descriptions of Cardenas's hair length—bald and short—should have been noted in the affidavit. [36] Viewing the facts in the light most favorable to Cardenas, the Court finds that A.E.L. and A.N.L.'s two descriptions of Cardenas's hair was information that was omitted from the affidavit and potentially material. As such, when the Court reviews the affidavit for probable cause, this information will be included.

c.      Cardenas's Place of Residence

Cardenas argues that the affidavit falsely reports that he resided with Balderas and their two daughters at the Bancroft residence. The affidavit states "After further investigative work, it was confirmed that Balderas, Cardenas and their two daughters were all residing at 1009 ½ N Bancroft St. throughout the month of June 2020; in the apartment next to where A.E.L. and A.N.L. were residing." It is uncontroverted that Detective Hernandez did not confirm that Cardenas resided at this address in June 2020. Accordingly, the Court will omit this information as it reviews the affidavit.

d.      Cardenas's Relation to Balderas and his Daughters

Cardenas argues that the affidavit misstates the relationship between himself and Balderas and their daughters. The affidavit states that "Cardenas was in a relationship with Balderas" and confirms that they have two daughters together.

The affidavit does not clarify that both Balderas and Cardenas denied being in a relationship in June 2020. Nevertheless, Detective Hernandez responds that his description that "Cardenas was in a relationship with Balderas" is not false. He argues that his description is vague

---

[36] Cardenas also asserts that the suspect was described as having a limp and A.N.L. described the suspect as clean-shaven. But the evidence supports a finding that these elaborations were first made at the preliminary hearing in March 2023, long after the affidavit was written in August 2022. The Court assesses probable cause based upon what was known to the officer at the time. *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1221 (10th Cir. 2020).

enough so as to be considered to refer to the past—when Balderas and Cardenas were in a relationship. But viewing the facts in the light most favorable to Cardenas, the statement certainly implies that Balderas and Cardenas were in a relationship at the time of the allegations. As such, the Court sets aside the fact that Balderas and Cardenas were in a relationship in reviewing the affidavit for probable cause.

Cardenas asserts that the affidavit should have indicated that the suspect was described as the stepfather of Balderas's daughters. It is uncontroverted that during A.E.L.'s forensic interview, she described the suspect as the stepfather of Balderas's daughters. The affidavit does not make the "step" distinction. Rather, it refers to Balderas's daughters as the "daughters" of the suspect.

Upon review of the video recorded interviews, the Court notes that A.E.L. initially refers to Balderas's daughters as the suspect's daughters and later clarifies that she thinks they are his stepdaughters. Further, A.N.L. refers to Balderas's daughters as "[the suspect's] kids" and that the suspect would come to the house to visit "his kids." Because both A.E.L. and A.N.L. refer to Balderas's daughters as the suspect's kids or daughters without further clarification during their forensic interviews, Cardenas cannot show that Detective Hernandez acted knowingly or with conscious disregard for the truth when he omitted the "stepdaughter" clarification from the affidavit. As such, the Court does not consider the "stepdaughter" clarification as omitted information that should be included in the Court's review of the affidavit for probable cause.

e.    Whether Detective Hernandez Spoke with Cardenas

Cardenas identifies that the affidavit omits the fact that Cardenas called Detective Hernandez back. Instead, the affidavit states "Cardenas was asked if he would be willing to speak with Detective Hernandez in reference to the allegations, Cardenas decline[d] to meet with Detective Hernandez – stating he would not speak with him." Cardenas suggests that the affidavit should include the following statement "Later [Cardenas] called back. He advised Detective

Hernandez that he had been very busy working in Liberal, Kansas and had not had time to call him." Although the affidavit certainly omits this fact, it is difficult to see the relevance of Cardenas's proposed addition. But even if the affidavit included a statement that Cardenas denied the allegations and provided a plausible explanation, such a statement would not serve to vitiate probable cause.[37]

    f.  Previous Allegations of Child Sex Offenses

  Cardenas argues that the affidavit should exclude mention of two prior allegations of child sex offenses in which Cardenas was listed as a suspect. The affidavit states "Previous case numbers in Finney County, Kansas – regarding an Aggravated Indecent Liberties with a Child and other sexual abuse allegations have listed Cardenas as a suspect – offending against his stepdaughter and biological daughter." Cardenas asserts that, during a deposition, Detective Hernandez was unable to articulate how these two incidents helped to establish probable cause. A review of the deposition testimony shows that Detective Hernandez explained that he mentioned these investigations in the affidavit because "it shows a history," "it's the exact type of investigation against this person," and "the nature of the crimes."

  But the affidavit does not demonstrate that Cardenas was charged, prosecuted, or even arrested on the basis of these prior investigations. And the uncontroverted facts establish that Cardenas communicated to Detective Hernandez that these allegations were investigated, unfounded, and he believed they were harassment. When coupled together and viewed in the light most favorable to Cardenas, these facts call into question the veracity of the allegations in the prior

---

  [37] *See id.* at 1221 ("Even a 'plausible explanation' does not require 'the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.'" (citation omitted)).

cases. As such, the Court will omit the reference to these prior investigations in its review of the affidavit for probable cause.

g.      Salient Facts in the Modified Affidavit Support a Finding of Probable Cause

A.E.L.'s photo line-up identification of Cardenas is sufficient on its own to satisfy probable cause.[38] But, after a review of Cardenas's contentions with the affidavit the Court is left with the following additional salient facts that support a finding of probable cause:

- Tina Sandoval, the mother of A.E.L. and A.N.L. reported that when A.E.L. and A.N.L. lived with their grandmother, Charlotte Sandoval, in Garden City A.E.L. reported that she was raped by a male boyfriend of a neighbor who lived next to their apartment.

- The female neighbor was identified as Patricia Balderas;

- Detective Hernandez confirmed that Balderas and Cardenas have two children together, including one named [H.];

- A.E.L. remembered the name of one of the suspect's daughters to be [H.];

- A.N.L. remembered Cardenas had two daughters and provided descriptors which later matched the identification of the suspect;

In sum, the Court determines that—after modifying the affidavit to exclude false information and to include the omitted information—the affidavit still supports a finding of

_____

[38] *See Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985) ("when examining informant evidence used to support a claim of probable cause for a warrant . . . the skepticism and careful scrutiny . . . is appropriately relaxed if the informant is an identified victim"); *Hartz v. Campbell*, 680 F. App'x 703, 706 (10th Cir. 2017) (collecting cases to support the conclusion that an eyewitnesses identification of a suspect is sufficient to establish probable cause). Notably, Plaintiff's expert also shares the opinion that a photo identification would establish probable cause.

probable cause. Because the modified affidavit establishes probable cause, the Court concludes that Cardenas cannot meet his burden to show that the Detective Hernandez's actions violated a federal constitutional right. Without such a showing, Cardenas cannot overcome Detective Hernandez's assertion of qualified immunity.

  2. *Prong 2: Clearly Established*

  Because the Court finds that Detective Hernandez did not violate Cardenas's Fourth Amendment Right, the Court need not fully address the second prong of the qualified immunity analysis—whether the right was clearly established. Briefly, however, whether an officer's conduct violates a defendant's clearly established Fourth Amendment rights rests on whether there was "arguable probable cause."[39] Put differently, the inquiry is whether an officer's "conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists."[40] Cardenas asserts the question is much simpler: that it is clearly established that police officers know they should not lie in an affidavit. Indeed, it is clearly established that an officer who "knowingly, or with reckless disregard for the truth" includes false statements in an affidavit violates a defendant's Fourth Amendment rights.[41] But again—this question turns whether there was "arguable probable cause."[42]

  Here—in light of A.N.L.'s identification of Cardenas, the fact that Cardenas was the father of H. who shares a name with the daughter of the suspect, and A.N.L.'s description matching

---

[39] *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014).

[40] *Id.*

[41] *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996).

[42] *Stonecipher*, 759 F.3d at 1141.

Cardenas—Detective Hernandez's belief that probable cause existed was objectively reasonable. In other words, it was grounded on arguable probable cause.

**B.    Claims against Garden City**

Section 1983 states, in relevant part: "Every *person* who under color of [law] subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."[43] The Supreme Court has held that, a municipality may be sued as a "person" under section 1983.[44] But a municipality cannot be sued under section 1983 merely for the acts of its employees.[45] Instead, plaintiffs must establish that the municipality's unconstitutional policy or custom was the direct cause or moving force behind the alleged injury.[46] Importantly though, when there is no underlying constitutional violation by one of its officers, a municipality cannot be held liable.[47]

Here, Cardenas's unlawful arrest and illegal detention claims against Garden City fail because the Court finds the affidavit leading to Cardenas's arrest established probable cause. Further, Cardenas's failure-to-train claim against Garden City assumes that Detective Hernandez violated Cardenas's Fourth Amendment rights when he conducted a flawed photo line-up. But as discussed above, even if Cardenas was able to prove that the photo line-up was flawed, it did not result in a constitutional violation. As such, Cardenas's claims against Garden City cannot survive summary judgment.

---

[43] 42 U.S.C. § 1983 (emphasis added).

[44] *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[45] *See id.* at 691 ("[W]e conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").

[46] *See id.* at 690, 694.

[47] *Hinton v. City of Elwood*, 997 F.2d 774, 783 (10th Cir. 1993).

**C.      Defendants' Motion to Exclude Expert Testimony**

Defendants also make a *Daubert*[48] motion to exclude Cardenas's expert's testimony at trial. Because the Court grants summary judgment in Defendants' favor, this motion is moot.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 54) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude Expert Testimony (Doc. 57) is **DENIED as moot**.

**IT IS SO ORDERED**.

This case is closed.

Dated this 4th day of September 2025.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[48] *Daubert v. Merrel Dow Pharms., Inc.*, 509 U.S. 579 (1993).